# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:09-CR-98-TLS |
| | ) | |
| JOHN EDWARD SCOTT | ) | |

## OPINION AND ORDER

The Defendant seeks to suppress an audio recording of an August 19, 2009, conversation, invalidate a search warrant, and exclude evidence seized during the execution of the search warrant that police obtained to search a residence at a particular address on Heritage Drive in Fort Wayne, Indiana, and statements he made after his arrest and during the recorded conversation. For the reasons set forth in this Opinion and Order, the Court denies his Motion to Suppress [ECF No. 53].

## PROCEDURAL BACKGROUND

The Defendant is charged in a four-count Indictment with two drug offenses (possessing with intent to distribute cocaine, and managing and controlling a building for the purpose of storing, distributing, and using cocaine, heroin, and marijuana) and two firearm offenses (possessing a firearm in furtherance of a drug trafficking crime, and being a felon in possession of a firearm). On September 17, 2010, the Defendant filed a Motion to Suppress [ECF No. 33], seeking to suppress evidence obtained during the search and any statements he made after his arrest. The Court conducted telephonic conferences with the parties, and the parties filed briefs regarding the Defendant's Motion. On December 6, the Court issued an Opinion and Order [ECF No. 46] denying the Defendant's Motion to Suppress.

On February 3, 2011, the Defendant filed a second Motion to Suppress [ECF No. 53], to which were attached the Search Warrant Affidavit [ECF No. 53-1] and the Search Warrant [ECF No. 53-2]. In his Motion, the Defendant requested a hearing. On February 18, the Government filed a Response [ECF No. 56], in which the Government indicated that the parties could agree on a stipulation regarding the facts. On February 24, the Court conducted a telephonic proceeding with counsel regarding the Motion. Counsel for the Government and the Defendant agreed that a hearing was not necessary and that they would address the facts by way of stipulation. The Court set deadlines for the submission of stipulated facts and briefs. On March 11, the parties filed a joint Stipulation [ECF No. 61]. On April 8, the Defendant filed a Brief in Support [ECF No. 62], and on May 11, the Government filed a Response Brief [ECF No. 63]. On May 13, the Government filed a Notice of Supplemental Authority [ECF No. 64].

## FACTS

The following facts are adopted nearly verbatim from the joint Stipulation[1] of the parties.

On August 19, 2009, detectives with the Allen County Drug Task Force used a confidential informant (CI or informant) to make a controlled purchase of heroin from Gerald Reynolds. The CI's person and vehicle were searched thoroughly by detectives, and no contraband or other evidence was found. The CI was outfitted with an audio recording device on his/her person, and Detective Jack Cain placed an audio recording device in a covert location within the CI's vehicle. While under constant surveillance by detectives, the CI drove his/her

---

[1] Attached to the Stipulation are a photograph of the subject residence on Heritage Drive (Exhibit A) and copies of the Search Warrant Affidavit and the Search Warrant (Exhibit B). The parties have also submitted copies of the Affidavit and the Warrant with other documents they have filed in the record.

vehicle to the Pine Haven Motel, and the CI entered a particular hotel room in order to meet with Reynolds to coordinate the heroin transaction.

After waiting for a period of time and after Reynolds coordinated a meeting with his suspected supplier over the telephone, both the CI and Reynolds left the hotel room, entered the CI's vehicle, and drove to a gas station parking lot. The CI exited the vehicle at the gas station, and Reynolds alone drove the CI's vehicle to a particular address on Heritage Drive, Fort Wayne, Indiana, where a surveillance detective was positioned. Reynolds parked the CI's vehicle in the driveway of the Heritage Drive residence about half way between the street and the house.

After Reynolds parked in the driveway of the Heritage Drive residence, an individual matching the description of the Defendant exited the residence and approached the driver's side of the vehicle where Reynolds was seated. They were together for about five minutes, and then the individual believed to be the Defendant returned to the house. Reynolds then backed out of the driveway and left the area. Reynolds returned to the gas station and took the CI back to the same hotel room. Once inside, Reynolds provided the heroin to the CI.

While Reynolds was parked in the driveway of the Heritage Drive residence, the audio recording device in the CI's vehicle recorded the conversation between Reynolds who was seated in the vehicle and the Defendant who remained outside the vehicle. During the course of that conversation, they discussed the price of the heroin, and the Defendant mentioned that he was trying to get some "yay," which the detectives believed meant cocaine, and that his supplier was charging him $150 for a "ball," which the detectives believed referred to an eighth of an ounce of cocaine. Reynolds said that he had a guy who was looking for a "quarter," which the

detectives believed to mean a quarter of an ounce of cocaine.

On August 24, 2009, the CI performed a second controlled buy. During this buy, a similar series of events occurred; however, upon Reynolds's arrival at the residence on Heritage Drive, he exited the CI's vehicle and approached the residence. There was, therefore, no audio recording of any conversation between the Defendant and Reynolds on this occasion.

With Reynolds under investigation, Reynolds was not told about the recording device in the CI's vehicle. The Defendant would testify that he also did not know about the recording device in the vehicle, and the Defendant would testify that he was the person who talked with Reynolds in the driveway of the residence on Heritage Drive on August 19, 2009. The Defendant would further testify that he had a subjective belief regarding an expectation of privacy in the conversation taking place in the driveway and that he was residing at the particular address on Heritage Drive at that time.

## SEARCH WARRANT AFFIDAVIT AND SEARCH WARRANT

On August 26, 2009, Allen County Police Department (ACPD) Detective Jack Cain, Deputy Prosecuting Attorney Jeffrey A. Stineburg, and Allen Superior Court Judge Kenneth R. Scheibenberger signed the Search Warrant Affidavit. The first paragraph of the Affidavit states:

> Detective Jack Cain of the Allen County Police Department swears that he believes and has Probable Cause to believe that certain evidence of drug activity including Heroin and derivatives thereof, controlled substances, United States Currency, firearms and/or weapons, records of drug transactions and/or financial information, which constitutes evidence of alleged drug transactions and illegal possession of said controlled substances, are concealed on or about the following property, to wit: [providing a detailed description of the Heritage Drive residence including a physical description of the building and the street address].

(Aff. 1.) The first sentence of the second paragraph of the Affidavit states: "In support of your

affiant's assertion of Probable Cause, the following facts are within your affiant's personal knowledge, to wit." (Aff. 1.)

In the remainder of the second paragraph, Detective Cain described the procedures police use in controlled drug buys with confidential informants (CIs). In controlled buys, police search CIs thoroughly prior to buys to ensure that CIs are not holding or hiding any contraband. Police outfit the CIs with audio recording devices, and constant surveillance of the CIs is maintained as the CIs travel to meeting locations and until the CIs complete the transactions and meet detectives after the deals. After the CIs hand over the drugs purchased, the CIs are again searched to ensure that no contraband items are present. If transactions occur inside residences, law enforcement officers maintain surveillance as the CIs enter and exit the residences, keeping all entrances and exits under surveillance while the CIs are inside.

The third paragraph indicates that police used a particular CI in this investigation. The Affidavit states that this CI had proven credible and reliable, that this CI had provided information and/or assisted law enforcement in the past that had resulted in the seizure of illegal narcotics, and that police had been able to corroborate information provided by this CI.

According to the fourth paragraph, on August 19 and August 24, 2009, police utilized this CI to perform two controlled buys of heroin. Police used the controlled-buy procedures outlined above. None of the pre-buy and post-buy searches of the CI produced any contraband. After each transaction, Detective Cain field tested the items purchased by the CI, and those items field tested positive for heroin, with approximate weights of 1.7 grams and 1.74 grams for the respective buys.

In the fifth paragraph, the Affidavit provides details about the controlled buys. With each

buy, the CI met with a suspect at a Bluffton Road address, and they traveled to a nearby gas station. While the CI waited at the gas station, the suspect drove the CI's vehicle to where he purchased the heroin. On both occasions, this suspect drove to a particular address on Heritage Drive, Fort Wayne, Indiana, and obtained the heroin. The suspect then returned to the gas station, and the suspect and the CI returned to the Bluffton Road address. Detectives maintained surveillance on this suspect and the CI during these events. Surveillance detectives observed the suspect arrive and leave the driveway of the residence on Heritage Drive. During the controlled buy on August 19, a detective observed an individual exit the Heritage Drive residence and approach the driver's side of the vehicle that the suspect was driving. A covert recording device captured a conversation between the individual who had exited the residence and the suspect that concerned the exchange of buy money for the heroin. On August 24, surveillance detectives observed the suspect arrive at the Heritage Drive residence, park in the driveway, and enter the residence. The suspect later exited the residence and departed for the gas station.

Paragraph six summarizes Detective Cain's experience. He had been a police officer for more than fourteen years, had received training in the methods of drug traffickers, and had participated in over one thousand drug investigations. Based upon the facts of this case and his training and experience, Detective Cain stated his belief that the illegal trafficking occurring at the Heritage Drive residence was a continuing enterprise, that narcotics traffickers commonly possess firearms, that drug traffickers typically keep track of the money associated with trafficking activities by using written and computer records, and that narcotics traffickers limit the number of individuals whom they allow to come to their residences to purchase narcotics in an attempt to remain undetected by law enforcement. In paragraph seven, Detective Cain

requested that the state court issue a warrant to search the Heritage Drive residence.

On August 26, 2009, Judge Scheibenberger signed and issued the Search Warrant. The Search Warrant begins by stating: "WHEREAS an Affidavit has been filed with me (and/or sworn testimony has been heard by me) that established Probable Cause." (Search Warrant 1.) The Search Warrant authorized a search of the Heritage Drive address for evidence of drug activity and seizure of property found during the search.

## DISCUSSION

The Defendant contends that the Court should suppress the audio recording and the contents of his conversation with Reynolds on August 19, 2009, because the police recorded the conversation in violation of the Defendant's Fourth Amendment rights and 18 U.S.C. § 2511. He also asserts that the Search Warrant Affidavit, which references the recorded conversation, and the Search Warrant, which was obtained based upon the Affidavit, are invalid, and he argues that the Court should suppress any and all evidence gathered as a result of that recorded conversation pursuant to the fruit of the poisonous tree doctrine. Finally, he contends that the officers, when executing the Search Warrant on August 31, 2009, failed to knock and announce their presence before entering the Heritage Drive residence. The Court will address each of the Defendant's contentions in turn.

### A.   The Recording of the Defendant/Reynolds Conversation

Relying upon *Katz v. United States*, 389 U.S. 347 (1967), the Defendant contends that he had a reasonable expectation of privacy in his conversation with Reynolds in the driveway of the

Heritage Drive residence on August 19, 2009, and that the police recording of this conversation violated his Fourth Amendment right to be free of unreasonable searches and seizures. His objection is to "the uninvited ear" of the police, and he argues that they could not lawfully listen in on his conversation, which was not open to public listening. To listen in, the Defendant contends, the police had to take several steps:

> [They] had to surreptitiously plant the recording devices very near to [the Defendant] or else they would not be able to record him. Accordingly, the [police] took a play from the world's oldest play-book. They updated the Trojan [h]orse decoy by using an automobile and putting Reynolds in the driver's seat without him knowing that he was driving the Trojan horse behind enemy lines into [the Defendant's] driveway for the sole purpose of allowing the [police] to eavesdrop on [his] private conversations.[2]

(Def.'s Br. in Supp. 8–9, ECF No. 62.) The Defendant claims that, like Katz, he had a right to rely upon the protection of the Fourth Amendment "when he left his house and walked into his driveway," such that he could reasonably believe that, "seeing no one there except Reynolds, [] what he said to Reynolds was not being monitored unbeknownst to [him] or Reynolds" by the police. (Def.'s Br. in Supp. 9, ECF No. 62.) The Defendant thus argues that the Court should consider his driveway part of his home's curtilage. Additionally, the Defendant maintains that the police violated 18 U.S.C. § 2511 (this statutory provision is one of several provisions of the federal criminal code commonly known as "Title III" that regulates electronic surveillance of oral and wire communications, *see* 18 U.S.C. §§ 2510 *et seq.* and *In re High Fructose Corn Syrup Antitrust Litigation*, 216 F.3d 621, 622 (7th Cir. 2000)) in recording the conversation and

---

[2] The Court notes that nothing in the stipulated facts suggests that the police put Reynolds in the driver's seat of the informant's vehicle. Rather, the facts are that the informant drove his or her vehicle to a motel where the informant met with Reynolds. The informant and Reynolds then drove in the informant's vehicle to a gas station, where the informant exited the vehicle, and Reynolds alone drove the informant's vehicle to the Heritage Drive address.

that neither he nor Reynolds consented to the interception or recording of the conversation.

The Government responds that the Defendant has to show that he held an expectation of privacy that society is prepared to recognize as reasonable. The Government argues that the Defendant fails under this standard because he did not have a reasonable expectation of privacy as to the conversation that he had in the driveway, which was exposed to public access. The Government contends that the Defendant did not shield the conversation from public access or attempt to limit public access by bringing Reynolds into a private area, that the conversation was conducted outside and within earshot of anyone interested in listening, that other houses were located near to his residence, that the conversation occurred close to the public street on a short and completely exposed driveway, and that there is a sidewalk located directly in front of the house. The Government also contends that the police only recorded conversation that occurred within the informant's vehicle, that most of the recorded conversation was between the informant and Reynolds as they rode together in the vehicle, and that there was no recording inside the Defendant's residence or anywhere other than the informant's vehicle.

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. When a search by a government agent infringes upon an expectation of privacy that society is prepared to consider reasonable, the search is unreasonable. *United States v. Crowder*, 588 F.3d 929, 934 (7th Cir. 2009). In challenging a search, a defendant must show that he had both a subjective and objective expectation of privacy in the item or location

searched. *Id.* Although exclusion of evidence obtained in violation of the Fourth Amendment is usually the remedy, *id.*, the Supreme Court has instructed that "[t]he fact that a Fourth Amendment violation occurred—i.e., that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies. Indeed, exclusion has always been our last resort, not our first impulse," *Herring v. United States*, 129 S.Ct. 695, 700 (2009) (quotation marks and citations omitted).

The protection of the Fourth Amendment against unreasonable searches and seizures is not limited to the four walls of one's home; it extends to the curtilage of the home as well. *United States v. French*, 291 F.3d 945, 951 (7th Cir. 2002); *Siebert v. Severino*, 256 F.3d 648, 653–54 (7th Cir. 2001). The curtilage of a home "encompasses 'the area outside the home itself but so close to and intimately connected with the home and the activities that normally go on there that it can reasonably be considered part of the home.'" *French*, 291 F.3d at 951 (quoting *Siebert*, 256 F.3d at 653–54). A curtilage line is not defined by a property line or a distance separating the home and the area searched, but rather by the use of the area and efforts to shield it from public view and access. *French*, 291 F.3d at 951–52. As the Seventh Circuit has observed, the Supreme Court has specified a four-factor inquiry to determine whether an area is within the curtilage of a home:

> [1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by.

*French*, 291 F.3d at 952 (quoting *United States v. Dunn*, 480 U.S. 294, 301 (1987)); *see also Dunn*, 480 U.S. at 300 (stating that "the central component of this inquiry [i]s whether the area harbors the 'intimate activity associated with the "sanctity of a man's home and the privacies of

life"'") (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)).

The Fourth Amendment "affords protection against the uninvited ear, [and] oral statements, if illegally overheard, and their fruits are [] subject to suppression." *Alderman v. United States*, 394 U.S. 165, 171 (1969) (citing *Silverman v. United States*, 365 U.S. 505 (1961), and *Katz*, 389 U.S. 347). Generally, government agents may not, consistent with the dictates of the Fourth Amendment and 18 U.S.C. § 2511, gather evidence against a criminal defendant by surreptitiously intercepting a wire or oral communication to which the defendant is a party. *Katz*, 389 U.S. at 352 (stating that Fourth Amendment protection extends to intrusions from the "uninvited ear" of the government); 18 U.S.C. § 2511(1)(a) (making it unlawful to "intentionally intercept[]," "endeavor[] to intercept," or "procure[] any other person to intercept or endeavor to intercept" any wire, oral, or electronic communication); 18 U.S.C. § 2511(1)(b) (making it unlawful to "intentionally use[], endeavor[] to use, or procure[] any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when—(i) such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication; or (ii) such device transmits communications by radio, or interferes with the transmission of such communication"). Where one of the parties to the communication consents to have the communication electronically monitored—with or without the defendant's knowledge—neither the Fourth Amendment nor Title III is offended. *United States v. White*, 401 U.S. 745, 753 (1970); 18 U.S.C. § 2511(2)(c) (stating that it is not unlawful for "a person acting under color of law to intercept a wire, oral, or electronic conversation, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception"). The federal electronic

surveillance statute defines "oral communication" as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation" and "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(2) & (4). If a wire or oral communication is intercepted in violation of Title III, "no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court." 18 U.S.C. § 2515. Congress intended this statute's definition of "oral communication" to "parallel 'the reasonable expectation of privacy test' articulated by the Supreme Court in *Katz*," requiring both a subjective and objective expectation of privacy. *United States v. Larios*, 593 F.3d 82, 92 (1st Cir. 2010) (quoting *United States v. Dunbar*, 553 F.3d 48, 57 (1st Cir. 2009), and citing *United States v. Longoria*, 177 F.3d 1179, 1181–82 (10th Cir. 1999)).

The recording of the conversation between the Defendant and Reynolds in the driveway of the Defendant's Heritage Drive residence on August 19, 2009, was not obtained pursuant to a warrant or the Defendant's consent. The Defendant and the Government have stipulated that the Defendant would testify that he had a subjective expectation of privacy in his conversation with Reynolds in the driveway of his Heritage Drive residence on August 19, 2009, that Reynolds was not told of the recording device in the informant's vehicle, and that the Defendant would testify that he did not know of the recording device in the informant's vehicle. Consequently, the key question is whether the Defendant had an objectively reasonable expectation of privacy in his oral communication with Reynolds on August 19, 2009. The Court finds that he did not.

This case presents an unusual set of circumstances. The informant in this case agreed to wear a wire on August 19, 2009, and an audio recording device was placed in a covert location in the informant's vehicle. The recording of conversation between the informant and Reynolds, who was under investigation, is not objectionable because of the informant's participation and consent to the monitoring of such conversation, and the Defendant would lack standing to challenge the recording of that conversation between the informant and Reynolds. *See United States v. Vargas*, 116 F.3d 195, 196 (7th Cir. 1997) ("'The interception of calls to which he was not a party did not intrude upon [the defendant's] fourth amendment rights, . . . so he has no standing to seek suppression of evidence gathered from those intercepts.'") (quoting *United States v. Thompson*, 944 F.2d 1331, 1339 (7th Cir. 1991)). For the Defendant, what is objectionable is the presence of the recording device on his property, but this device arrived in his driveway not as the direct result of police conduct, but as a direct result of his associate driving the informant's vehicle to the Defendant's residence.[3] Although a recording device was concealed in the informant's vehicle, the informant (who possessed the vehicle as his or her own) had agreed to wear a wire and had consented to the monitoring of his conversations. Thus, this case presents a situation that began with the informant and his vehicle being wired for a controlled buy on August 19, 2009, but the situation changed when Reynolds, one of the Defendant's associates, drove the informant's vehicle to the Defendant's residence. With his Motion to Suppress, the Defendant seeks to take advantage of the protection afforded by the Fourth Amendment by characterizing the monitoring and recording through the covert listening

---

[3] There is no evidence before the Court that the police planted a recording device or recorded any conversation within the Defendant's home.

device as illegal electronic monitoring and recording, even though it was his associate's conduct (and not that of the police) that brought the device to the Defendant's driveway. The Court is mindful that the Constitution does not protect criminals against the risk that their associates will assist the police. *United States v. Warneke*, 310 F.3d 542, 545 (7th Cir. 2002) (citing *Hoffa v. United States*, 385 U.S. 293, 300–03, 310–12 (1966)).

The evidence before the Court does not show that the Defendant had a reasonable expectation of privacy in his driveway conversation. Although the driveway of the Defendant's home is in fairly close proximity to the house, "the proximity to the home, standing by itself, does not per se, suffice to establish an area as within the curtilage." *French*, 291 F.3d at 952. The house is in a residential area with neighboring houses. Although Reynold parked the informant's vehicle on the short driveway about half way between the street and the house, the driveway is in the front yard, and it is not enclosed. Additionally, a sidewalk runs parallel to the street and crosses through the driveway. There is no evidence before the Court showing efforts to shield the driveway from public view or access or to protect the driveway area from observation by people passing by on the street or the sidewalk. There is no evidence that the driveway was enclosed by a gate or a fence or that the driveway was used for the sort of intimate activity associated with the sanctity of a person's home and the privacies of life. The evidence before the Court shows that the Defendant used the driveway, as would be customary, to park automobiles. Thus, the Defendant did not restrict access to the driveway of his Heritage Drive residence, and the public had access to the driveway. Consequently, the Court finds that the driveway where the conversation between the Defendant and Reynolds took place was not within the curtilage of the Defendant's home. *See id.* at 953 (stating that "we have held that public drives, sidewalks, or

walkways (even those which lead to a rear side door) are not within the curtilage of the home when they are not enclosed by a gate or fence"); *United States v. Evans*, 27 F.3d 1219, 1228–29 (7th Cir. 1994) (holding that the approach to the garage by government agents "did not implicate a Fourth Amendment interest because [the defendant] did not present any evidence at the suppression hearing that he had a reasonable expectation of privacy in the driveway" and that there "was no evidence that the public had limited access to [the] driveway, hence [the defendant] had no reasonable expectation that members of the public or [law enforcement] agents would refrain from entering it").

The facts of this case differ in significant ways from the facts in *Katz*. In *Katz*, the Supreme Court noted that "what [Katz] sought to exclude when he entered the booth was not the intruding eye—it was the uninvited ear. . . . One who occupies [a public telephone booth], shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world." *Id.*, 389 U.S. at 352. In this case, the Defendant has not shown that he took any steps to exclude the uninvited ear, such as taking Reynolds into his residence or another enclosed space within the curtilage of his home. To the contrary, he left his house and approached Reynolds who was driving another person's vehicle that was parked about half way up the driveway and not far from the street and the public sidewalk that crossed through the driveway. There, in a residential neighborhood and in a publicly accessible area, he engaged in a conversation with Reynolds who was sitting in another person's vehicle.

For these reasons, the Court finds that the Defendant knowingly exposed his conversation in the driveway to the public and that, as a result, he did not have a reasonable expectation of

privacy in the publicly accessible area of his driveway where he and Reynolds engaged in their conversation.

**B.    The Validity of the Search Warrant Without Recorded Conversation**

The Government contends that even if the Court were to find that the driveway conversation was improperly recorded and excised from the Search Warrant Affidavit, the remaining facts in the Affidavit were sufficient for probable cause. The Court agrees.

The Seventh Circuit has instructed that "[a] search warrant obtained, in part, with evidence [that] is tainted can still support a search if the 'untainted information, considered by itself, establishes probable cause for the warrant to issue.'" *United States v. Gray*, 410 F.3d 338, 344 (7th Cir. 2005) (quoting *United States v. Oakley*, 944 F.2d 384, 386 (7th Cir. 1991)). In such a circumstance, "[t]he connection with the unlawful search must be 'so attenuated as to dissipate the taint.'" *Id.* (quoting *Murray v. United States*, 487 U.S. 533, 537 (1988) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939))). In assessing whether the results of a subsequent search must be suppressed, courts "ordinarily consider whether the illegally obtained evidence affected the magistrate's decision to issue the warrant and, secondly, whether the agent's decision to obtain a warrant was prompted by knowledge of the results of the earlier illegal search." *Id.* (citing *United States v. Markling*, 7 F.3d 1309 (7th Cir. 1993)); *United States v. Real Prop. at 15324 County Hwy. E.*, 332 F.3d 1070 (7th Cir. 2003).

When an "affidavit is the only evidence presented to the warrant-issuing magistrate, 'the warrant must stand or fall solely on the contents of the affidavit.'" *United States v. Koerth*, 312 F.3d 862, 866 (7th Cir. 2002) (quoting *United States v. Roth*, 391 F.2d 507, 509 (7th Cir. 1967)).

16

The "central teaching of [Supreme Court] decisions bearing on the probable cause standard is that it is a 'practical, nontechnical conception.'" *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232. "Probable cause is established when, based on the totality of the circumstances, the affidavit sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime." *United States v. Peck*, 317 F.3d 754, 756 (7th Cir. 2003). For this reason,

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Gates*, 462 U.S. at 238. "In issuing a search warrant, a magistrate is given license to draw reasonable inferences concerning where the evidence referred to in the affidavit is likely to be kept, taking into account the nature of the evidence and the offense." *United States v. Singleton*, 125 F.3d 1097, 1102 (7th Cir. 1997). For example, in issuing a warrant, a judge may infer that evidence of drug dealing is likely to be found where a dealer lives. *Id.* "[W]hen observing activity of a person suspected of criminal activity, Government agents are entitled to reasonably rely upon their special knowledge and expertise to assess probabilities and draw inferences," *United States v. Marin*, 761 F.2d 426, 432 (7th Cir. 1985), and a judge may take into account the experience and special knowledge of officers if the search warrant affidavit explains the significance of specific types of information, *United States v. Lamon*, 930 F.2d 1183, 1189 (7th Cir. 1991). "Generally, a controlled buy, when executed properly, is a reliable indicator as to the

presence of illegal drug activity." *United States v. Sidwell*, 440 F.3d 865, 869 (7th Cir. 2006) (finding that a controlled buy was adequate to support probable cause where the confidential informant entered the building without contraband, exited moments later, and produced cocaine). "A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" *Gates*, 462 U.S. at 236 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Id.* at 238–39 (quotation marks, brackets, and ellipsis omitted).

In this case, the recorded conversation was a minor fact in the Search Warrant Affidavit. The Affidavit included the following conversation-related statement: "The conversation between the suspect and the individual that existed the residence was recorded by a covert recording device and captured conversation concerning the exchange of buy money for heroin." (Aff. 5.) The Affidavit included an array of other facts. In the Affidavit, Detective Cain described the Heritage Drive residence and stated the procedures followed in controlled buys generally. He provided details regarding the confidential informant (including facts supporting the informant's credibility and reliability and reference to use of this informant by the police in the past). The Affidavit also stated detailed facts related to the controlled buys on August 19 and August 24 and the procedures followed before and after the controlled buys to ensure that the informant had no contraband in his possession or his vehicle other than contraband obtained through the controlled buys. The facts included: Reynolds and the informant traveled from an address on Bluffton Road to a gas station; Reynolds drove the informant's vehicle from the gas station to the Heritage Drive residence; Reynolds returned to the gas station and picked up the informant;

Reynolds and the informant returned to the Bluffton Road address; the police maintained visual surveillance of Reynolds and the informant; the police observed Reynolds arrive at and leave the Heritage Drive residence after parking in the driveway; during the August 19 buy, a detective observed an individual leave the residence and approach the driver's side of the vehicle that Reynolds was driving; during the August 24 buy, the police observed Reynolds arrive at the Heritage Drive residence, park in the driveway, enter the residence, exit the residence approximately five minutes later, and return to the gas station; the drugs obtained through the controlled buys field tested positive for heroin; and the amounts of heroin purchased through the controlled buys was 1.7 grams and 1.74 grams, respectively. The Affidavit concluded with a summary of Detective Cain's training and experience, including his fourteen years as a police officer, his participation in over one thousand narcotics investigations, and his knowledge that narcotics traffickers limit the number of individuals who come to their residences to purchase narcotics in an effort to remain undetected by law enforcement, and it stated his beliefs regarding ongoing illegal drug activity at the Heritage Drive residence based upon the facts of the investigation. The Warrant was issued on August 26, 2009, two days after the second controlled buy.

The trail of evidence from the two controlled heroin buys clearly led to the Heritage Drive residence. Considering the evidence of illegal drug activity linked to the Heritage Drive residence, the Court finds that the evidence regarding the recorded conversation did not affect the decision of the issuing judge (Judge Scheibenberger) and that probable cause to issue the Warrant existed based upon the facts in the Affidavit, even if Detective Cain's statement regarding the recorded conversation were excised from the Affidavit. Likewise, considering the

facts within Detective Cain's personal knowledge, the Court finds that his decision to obtain a warrant was prompted by his knowledge of lawfully conducted surveillance of two controlled drug buys, and not any knowledge of any illegal search.[4]

## C.     The Circumstances of Police Entry into the Residence

The Defendant alleges that the officers did not knock and announce their presence before making entry at the Heritage Drive residence when the officers executed the search warrant on August 31, 2009, and that the Warrant did not authorize a no-knock entry and search. On this basis, the Defendant asks the Court to suppress all evidence gathered during the search of his Heritage Drive residence.[5] The Government responds that facts relative to the alleged no-knock entry have not been developed, that officers may dispense with knocking and announcing under certain circumstances, and that even if the police violated the knock-and-announce rule, suppression of evidence is not an available remedy.

---

[4] The Government argues that even if the Warrant were to be found to lack a sufficient probable cause basis, evidence obtained in the execution of the warrant need not be suppressed because the police relied upon the warrant in good faith. This issue extends beyond the parties' stipulated facts, and the Court will not issue a ruling on it.

[5] Relying upon *Wilkins v. State*, 930 N.E.2d 652 (Ind. Ct. App. 2010), and *Lacey v. State*, 931 N.E.2d 378 (Ind. Ct. App. 2010), the Defendant argues that, if his case were heard in an Indiana state court, his knock-and-announce argument would likely prevail. The Defendant has not shown that this state court precedent would bind this Court on this issue, and the Indiana Supreme Court granted transfer in each case. In *Wilkins v. State*, the Indiana Supreme Court vacated in part the Indiana Court of Appeals opinion, determined that the defendant waived any claim that the execution of the warrant violated the search and seizure clause of the Indiana Constitution (Article 1, § 11), observed that a violation of the knock-and-announce rule would not entitle the defendant to suppression under federal jurisprudence, and affirmed the trial court's denial of the defendant's motion to suppress. *Id.*, 946 N.E.2d 1144, 1147–48 (Ind. 2011). In *Lacey v. State*, the Indiana Supreme Court affirmed the trial court's denial of the defendant's motion to suppress and held that Article 1, § 11 of the Indiana Constitution does not require prior judicial authorization for the no-knock execution of a warrant when such is justified by exigent circumstances, even if such circumstances are known by police when the warrant is obtained. *Id.*, 946 N.E.2d 548, 552–53 (Ind. 2011). The Defendant's argument on this issue fails.

The Supreme Court has held that the remedy of suppression is not available for a violation of the knock-and-announce rule. *Hudson v. Michigan*, 547 U.S. 586, 594 (2006); *see also United States v. Langford*, 314 F.3d 892, 894 (7th Cir. 2002) (holding that "violation of the rule does not authorize exclusion of evidence seized pursuant to the ensuing search"); *United States v. Sutton*, 336 F.3d 550, 552 (7th Cir. 2003) (same); *United States v. Brown*, 333 F.3d 850, 853 (7th Cir. 2003) (same). Thus, even if credible evidence were before the Court that the officers did not knock and announce before entering the Defendant's residence, the remedy for any such violation is not suppression of evidence, as the Defendant requests. Consequently, the Court will deny the Defendant's request to suppress evidence based upon the alleged failure of the police to knock and announce before entering his Heritage Drive residence.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion to Suppress [ECF No. 53] is DENIED.

SO ORDERED on June 10, 2011.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT